IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| REGINALD BEDFORD, TDCJ #1143770, | § § § | |
| Plaintiff, | § § § | |
| v. | § § | CIVIL ACTION NO. H-06-1478 |
| P.A. NAGEL, *et al.*, | § § § | |
| Defendants. | § | |

## **MEMORANDUM AND ORDER**

Plaintiff Reginald Bedford is a state inmate incarcerated in the Texas Department of Criminal Justice - Correctional Institutions Division (collectively, "TDCJ"). He has filed a complaint under 42 U.S.C. § 1983, alleging that he received inadequate medical care in violation of his civil rights. Bedford proceeds *pro se* and *in forma pauperis*. At the Court's request, Bedford has provided a more definite statement of his claims (Doc. # 6), and the Texas Attorney General's Office has submitted a report to supplement the record with information about Bedford's medical treatment (Doc. # 9).[1] Bedford has filed a response to the Attorney General's report (Doc. # 11). After reviewing all of the pleadings, the Court concludes that this case must be **dismissed** for reasons that follow.

---

[1]  The Court requested the records pursuant to *Martinez v. Aaron*, 570 F.2d 317 (10th Cir. 1987). *See Cay v. Estelle*, 789 F.2d 318, 323 & n.4 (5th Cir. 1986) (discussing the utility of a *Martinez* report).

I.  **BACKGROUND**

Bedford is currently in custody at TDCJ's Ellis Unit in Huntsville, Texas. Bedford sues Physician's Assistant ("P.A.") Charles Nagel and Registered Nurse ("R.N.") Kathy Hawkins, both of whom are employed by the University of Texas Medical Branch ("UTMB") to provide health care to TDCJ inmates at the Ellis Unit facility. Bedford also sues UTMB and a "Medical Director" identified as Mrs. Crawford.

Bedford complains that the defendants provided inadequate medical care when they failed to order an MRI or an X-ray for his sore knee in December of 2005. Instead, P.A. Nagel reportedly told Bedford that his knee was aggravated because he is obese.[2] Bedford insists that the defendants were "negligent" in failing to order an MRI or an X-ray for his knee and that they were therefore deliberately indifferent to his medical needs in violation of the Eighth Amendment to the United States Constitution. Bedford seeks damages for the pain and suffering he has experienced as the result of the defendants' negligence. He also seeks injunctive relief in the form of an MRI for his knee. The Court concludes, however, that Bedford's complaint must be dismissed for reasons discussed below.

II.  **STANDARD OF REVIEW**

The complaint in this case is governed by the Prison Litigation Reform Act (the "PLRA"), which mandates the dismissal of a prisoner's civil rights complaint under the following circumstances. Upon initial screening of a prisoner civil rights complaint, the

---

[2]   As noted further below, the medical records reflect that Bedford is 6 feet in height and that he weighed between 251 and 255 pounds throughout the period of time relevant to his claim.

PLRA requires a district court to scrutinize the claims and dismiss the complaint, in whole or in part, if it determines that the complaint "is frivolous, malicious, or fails to state a claim upon which relief may be granted;" or "seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b). A reviewing court may dismiss a complaint for these same reasons "at any time" where a party proceeds *in forma pauperis*. 28 U.S.C. § 1915(e)(2)(B) (mandating dismissal where the complaint is "frivolous or malicious," "fails to state a claim upon which relief may be granted," or "seeks monetary relief from a defendant who is immune from such relief"). The PLRA also provides that the court "shall on its own motion or on the motion of a party dismiss an action" if it is satisfied that the complaint is "frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant who is immune from such relief." 42 U.S.C. § 1997e(c).

In conducting the foregoing analysis, a prisoner's *pro se* pleadings are reviewed under a less stringent standard than those drafted by attorneys and are entitled to a liberal construction that includes all reasonable inferences which can be drawn from them. *See Haines v. Kerner*, 404 U.S. 519 (1972); *Alexander v. Ware*, 714 F.2d 416, 419 (5th Cir. 1983). "A district court may dismiss as frivolous the complaint of a prisoner proceeding IFP if it lacks an arguable basis in law or fact." *Geiger v Jowers*, 404 F.3d 371, 373 (5th Cir. 2005). "A complaint lacks an arguable basis in law if it is based on an indisputably meritless legal theory, such as if the complaint alleges the violation of a legal interest which clearly does not exist." *Siglar v. Hightower*, 112 F.3d 191, 193 (5th Cir. 1997). A review for failure

to state a claim is governed by the same standard used to review a dismissal pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See Newsome v. EEOC*, 301 F.3d 227, 231 (5th Cir.) (citing *Moore v. Carwell*, 168 F.3d 234, 236 (5th Cir. 1999) (citation omitted)), *cert. denied*, 537 U.S. 1049 (2002). Under that standard, courts must assume that the plaintiff's factual allegations are true, and a dismissal is proper only if it appears that no relief could be granted under any set of facts that could be proven consistent with the allegations. *See id*. (citations omitted).

## III.   DISCUSSION

In this case, Bedford's sole claim is that the defendants violated his constitutional rights under the Eighth Amendment to the United States Constitution by failing to order an MRI or an X-ray to discover the cause of pain in his left knee. "Although the Eighth Amendment 'does not, by its precise words, mandate a certain level of medical care for prisoners[,]' the Supreme Court has interpreted it as imposing a duty on prison officials to 'ensure that inmates receive adequate . . . medical care.'" *Easter v. Powell*, 467 F.3d 459, 463 (5th Cir. 2006) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). "A prison official violates the Eighth Amendment's prohibition against cruel and unusual punishment when his conduct demonstrates deliberate indifference to a prisoner's serious medical needs, constituting an 'unnecessary and wanton infliction of pain.'" *Id.* (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991) (quoting *Estelle v. Gamble*, 429 U.S. 97 (1976)).

The deliberate-indifference standard has both an objective and subjective component. *See Farmer*, 511 U.S. at 834. To establish deliberate indifference under this standard, the

4

prisoner must show that the defendants were both (1) aware of facts from which an inference of an excessive risk to the prisoner's health or safety could be drawn, and (2) that they actually drew an inference that such potential for harm existed. *See id.* at 837; *Harris v. Hegmann*, 198 F.3d 153, 159 (5th Cir. 1999). Under the subjective prong of this analysis, "[a] prison official acts with deliberate indifference 'only if [(A)] he knows that inmates face a substantial risk of serious bodily harm and [(B)] he disregards that risk by failing to take reasonable measures to abate it.'" *Gobert v. Caldwell*, 463 F.3d 339, 347 (5th Cir. 2006) (quoting *Farmer*, 511 U.S. at 847).

The Fifth Circuit has stated that the deliberate-indifference standard is an "extremely high" one to meet. *Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001). "Unsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference, nor does a prisoner's disagreement with his medical treatment, absent exceptional circumstances." *Gobert*, 463 F.3d at 347 (citations omitted). A showing of deliberate indifference requires the prisoner to demonstrate that prison officials "'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'" *Id.* (citations omitted). A review of Bedford's allegations in light of the record of care that he received, as summarized briefly below, does not demonstrate that there was any deliberate indifference on the defendants' part.

Bedford submitted a "sick call request" on November 8, 2005, complaining of shortness of breath, "fluid" in his left knee, a "stuffy nose," ringing in his ears, and assorted

5

skin irritations.  (Doc. # 9, Exhibits to Attorney General's Report, A-4).  Bedford claimed that his current pain medication was not helping, and he also requested some cream to treat "athlete's foot."  (*Id.*).  The next day, P.A. Alfredo Mayuman examined Bedford in his cell for security reasons because of a facility lockdown in place at the Ellis Unit.  (*See* Attorney General's Report at 2, and Exhibits at A-5).  Mayuman noted that Bedford was "irate" and "verbally abusive" during the examination.  (*Id.* at A-5).  He noted "no [bilateral] swelling" in Bedford's knees or any other symptoms.  (*Id.*).  Bedford, who weighed 251 pounds, already had prescriptions for Benzoyl Peroxide, Hydrochorothiazide, Ibuprofen, Naproxen, and Ranitidine HCL.  (*Id.*).  Because the examination was "normal," Mayuman recommended no additional treatment on that occasion.  (*Id.*).

Bedford submitted another sick call request on November 19, 2005, complaining of "pain and swelling behind [his] knee," as well as "burning" on the bottom of his feet, headaches, and a stuffy nose.  (*Id.* at A-7).  He also asked the medical department to renew his "clipper" pass to exempt him from having to shave.  (*Id.*).  In response to this request, medical personnel scheduled an examination for Bedford at the clinic on November 21, 2005, but Bedford did not show up for that appointment.  (*Id.* at A-9).

Bedford submitted another sick call request on November 23, 2005, complaining that the back of his left knee was swollen and painful.  (*Id.* at A-10).  He also repeated his other complaints about a headache, stuffy nose, and burning feet, as well has his request for a renewed clipper shave pass.  (*Id.*).  Once again, Bedford failed to attend the medical appointment scheduled for him the following day on November 24, 2005.  (*Id.* at A-11).

On November 28, 2005, Bedford submitted another sick call request complaining of painful swelling behind his left knee.  (*Id.* at A-13).  Bedford complained further of headaches, a "runny nose," ringing in his ears, and pain in his right wrist and arm.  (*Id.*).  On November 30, 2005, Bedford was examined by Licensed Vocational Nurse ("L.V.N.") Sandra Henderson.  (*Id.* at A-14-16).  Medical records of the examination reflect that Bedford suffers from chronic high blood pressure (hypertension) and high cholesterol (hypercholesterolemia).  (*Id.* at A-14).  The nurse observed "mild swelling" in Bedford's left knee, that his range of motion was "fair," and that his gait was within normal limits.  (*Id.*).  At 255 pounds, Bedford was diagnosed with obesity and "strongly advised" to lose weight.  (*Id.* at A-15).  Bedford was ordered to continue his regimen for blood pressure monitoring and he was given the following prescriptions: Atenol, Chlorphen, Dyazide, Naproxen, and Ranitidine HCL.  (*Id.*).

On December 1, 2005, Bedford was examined by a physician, Dr. Kokila Naik, who treated him for a right ankle injury.  (*Id.* at A-21).  This physician ordered a pair of medical boots for Bedford from the brace and limb clinic, which reportedly "fit fine."  (*Id.*).

On December 15, 2005, Bedford submitted an I-60 official request for an X-ray for his left knee, which was reportedly "very painful."  (*Id.* at A-23).  In that request, Bedford disputed that his weight had anything to do with his sore knee.  (*Id.*).  Bedford was examined the next day, on December 16, 2005, by one of the defendants, R.N. Hawkins, and P.A. Mayuman. (*Id.* at A-25).  Bedford's weight at that time was 253 pounds.  (*Id.*).  Bedford confirmed that he had been told to lose weight. (*Id.*).  When asked if he had lost any weight,

Bedford reportedly became "agitated" and insisted that his weight was not the cause of his knee pain. (*Id.*). After Bedford became abusive and began moving "his head and hands all around and talking loud," he was asked to leave the examination room. (*Id.*). Security escorted Bedford from the clinic, at which time no "acute visible distress" was noted. (*Id.*).

Bedford submitted another I-60 official request form on January 19, 2006, complaining about pain in the front and back of his left knee. (*Id.* at A-30). Bedford also asked for another examination at the brace and limb clinic for tennis shoes with better support than the ones available at the prison commissary. (*Id.*). The next day, on January 20, 2006, Bedford was examined by L.V.N. Henderson regarding his complaints about knee pain. (*Id.* at A-31). She noted that an X-ray of Bedford's knee in 2003 had shown that it was "essentially normal with arthritic changes." (*Id.*). Bedford's weight was listed as 255 pounds. (*Id.*). Nurse Henderson scheduled a follow-up appointment for Bedford with the brace and limb clinic to address his request for extra shoes. (*Id.*).

Bedford was examined again on January 24, 2006, for his complaints of knee pain. (*Id.* at A-32). On that occasion P.A. Nagel noted that Bedford's foot pain was caused by "bilateral bunions" that resulted in his need for medical boots, which had been supplied previously by the brace and limb clinic. (*Id.*). P.A. Nagel observed no "effusions" from Bedford's knees, but noted that his weight was 255 pounds, that he was "morbidly obese," and had been told to lose weight to help with his knee pain. (*Id.*). P.A. Nagel prescribed a plan that emphasized weight loss for control of Bedford's knee pain in addition to "assistive help in controlling" his hypertension and arthritis. (*Id.*). P.A. Nagel advised

Bedford to increase his exercise, to "eat much less," and to follow a "proper low salt diet." (*Id.*).

On January 26, 2006, Bedford submitted a sick call request, complaining about poor circulation in his left knee and toes, burning on the bottom of his feet, and a stuffy nose. (*Id.* at A-33). Bedford was examined in the clinic the next day, on January 27, 2006, where he requested a medical pass for a new pair of tennis shoes. (*Id.*). Bedford reportedly told the examining health care provider that he needed the shoes for the pain in his left knee and left foot because his medication was not helping. (*Id.*). Noting that Bedford had been seen on January 24, 2006 for these precise complaints, Bedford was told to follow the plan prescribed for him on that date. (*Id.*).

Approximately one month later, on February 23, 2006, Bedford submitted an I-60 official request for an "MRI X-ray" to learn the cause of his left knee pain. (*Id.* at 38). He also complained about continuing congestion and cold symptoms, including a stuffy nose. (*Id.*). Bedford asked for "saline and cold busters" to treat those symptoms. (*Id.*).

Bedford was examined in the clinic the following day on February 24, 2006, by P.A. Nagel and L.V.N. April Eernisse. (*Id.* at 40). Bedford requested an MRI for his knees, but he was observed ambulating to the clinic "with a steady gait" and "no difficulties" were noted in his ability to walk. (*Id.*). Bedford denied any injury to his knees. (*Id.*). His weight was 253 pounds. (*Id.*). Bedford was told to exercise and eat less to control his weight and hypertension. (*Id.*). Because of his hypertension, the providers were unable to prescribe the

antihistamines requested by Bedford, as these tend to elevate blood pressure.  (*Id.*).  Bedford was given a nasal spray instead.  (*Id.*).

On February 28, 2006, Bedford submitted another I-60 official request form asking for treatment for his persistent knee pain and an "MRI X-ray."  (*Id.* at A-41).  On March 1, 2006, Bedford was seen in the clinic regarding his request.  (*Id.* at A-42).  Bedford was examined by P.A. Mayuman, who observed that a prior X-ray contained "normal findings" except for "mild arthritic changes."  (*Id.*).  An examination of the knees disclosed "no swelling" or "point tenderness."  (*Id.*).  A patellar examination was "stable and non[-]tender."  (*Id.*).  Bedford was observed to be "ambulating without difficulty."  (*Id.*).  Mayuman characterized Bedford as "obese."  (*Id.*).  Bedford's weight at the time of this examination was 255 pounds. (*Id.*).  Bedford was again instructed to lose weight "to minimize [the] weight load on [his] knees."  (*Id.*).  There is no record of any further requests for medical treatment before Bedford filed this suit on April 28, 2006.

The record shows that Bedford has not been denied medical care.  The allegations raised in Bedford's pleadings accuse the defendants of negligent failure to provide proper care and reflect a disagreement of opinion about the level of treatment that Bedford received.  In particular, Bedford complains that the defendants have acted with deliberate indifference because they refused to order an MRI or an X-ray.  Such a claim cannot form the basis of a constitutional violation.  As the Supreme Court has expressly noted, "the question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment."  *Estelle v. Gamble*, 429 U.S. 97, 107 (1976).

10

Thus, a "medical decision" concerning whether to order an X-ray, or like measures, "does not represent cruel and unusual punishment." *Id.* "At most it is medical malpractice." *Id.* It is well established that allegations of malpractice or "mere negligence in failing to supply medical treatment" will not suffice to demonstrate an Eighth Amendment claim. *Gibbs v. Grimmette*, 254 F.3d 545, 549 (5th Cir. 2001), *cert. denied*, 534 U.S. 1136 (2002); *Stewart v. Murphy*, 174 F.3d 530, 534 (5th Cir.) ("[A]lthough inadequate medical treatment may, at a certain point, rise to the level of a constitutional violation, malpractice or negligent care does not."), *cert. denied sub nom. Stewart v. Knutson*, 528 U.S. 906 (1999).

To the extent that Bedford is dissatisfied with the level of his treatment or with the diagnoses, the Fifth Circuit has held repeatedly that mere disagreement with medical treatment does not state a claim for deliberate indifference to serious medical needs under the Eighth Amendment. *See Gobert*, 463 F.3d at 347; *Stewart*, 174 F.3d at 535; *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997); *Spears v. McCotter*, 766 F.2d 179, 181 (5th Cir. 1985). Even if a lapse in professional judgment occurred, any such failure amounts to mere negligence or malpractice, and not a constitutional violation. *See Harris v. Hegman*, 198 F.3d 153, 159 (5th Cir. 1999) (citing *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993)). Because Bedford has not articulated a constitutional violation, the Court concludes that his complaint fails to state a claim upon which relief can be granted and that it is subject to dismissal under § 1915(e)(2)(B) for this reason.

11

## IV. CONCLUSION AND ORDER

Based on the foregoing, the Court **ORDERS** that this case is **DISMISSED** with prejudice, under 28 U.S.C. § 1915(e)(2)(B), for failure to state a claim upon which relief can be granted.

**The Clerk is directed to provide a copy of this order to the parties. The Clerk will also provide a copy of this order by regular mail, facsimile transmission, or e-mail to: (1) the TDCJ - Office of the General Counsel, P.O. Box 13084, Austin, Texas, 78711, Fax Number (512) 936-2159; and (2) the District Clerk for the Eastern District of Texas, Tyler Division, 211 West Ferguson, Tyler, Texas, 75702, Attention: Manager of the Three-Strikes List.**

SIGNED at Houston, Texas, this **26th** day of **December, 2006**.

_____
Nancy F. Atlas
United States District Judge